**2015 UT App 275**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DARRYL KENNETH BOSSERT,
Appellant.

Opinion
No. 20130842-CA
Filed November 12, 2015

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 121901450

Nathalie S. Skibine and Samuel J. Hanseen,
Attorneys for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and STEPHEN L. ROTH concurred.

ORME, Judge:

¶1    Darryl Kenneth Bossert (Defendant) appeals his convictions on two counts of endangerment of a child, third degree felonies. *See* Utah Code Ann. § 76-5-112.5(2)(a) (LexisNexis 2012). We affirm.

BACKGROUND[1]

¶2    In February 2012, Defendant's ten-year-old son (Son) was living with Defendant. Defendant's friends and girlfriends frequently visited Defendant's house, from which Defendant sold methamphetamine. In fact, almost everyone who came to Defendant's house used drugs, particularly marijuana and meth. Son would sometimes discuss drugs with Defendant and Defendant's friends, asking questions about meth and what it "smelled like and . . . looked like when they were breathing it out." Son also knew that Defendant sold meth from the house.

¶3    Son frequently used marijuana with Defendant's consent, and Defendant gave Son marijuana "[t]wenty-five to 30 times." Defendant's friends also gave Son drugs and drug paraphernalia. One friend gave Son meth and a "red mushroom pipe." Son tried meth twice, explaining, "Because I was curious and I wanted to know what it was like because I thought it would be cool if I did it." Son testified that using meth gave him a "[g]ood feeling" and made him "feel cool."

¶4    When Son told Defendant's friends that he was smoking meth, they informed Defendant, who "really yelled" at Son for using meth. But Defendant did not stop giving Son marijuana, using drugs in Son's presence, or inviting drug users into the home. Defendant did not remove drugs or drug paraphernalia from his house, and he did not lock up his drugs or keep them where Son could not access them.

¶5    On the evening of February 6, 2012, Defendant once again gave Son marijuana. Son did not go to bed that night. Instead, around 3:00 or 4:00 a.m., Son found a meth pipe on a counter in

---

1. "On appeal, we recite the facts in the light most favorable to the jury's verdict." *State v. Martinez*, 2013 UT App 154, ¶ 2 n.1, 304 P.3d 110 (citation and internal quotation marks omitted).

the front room of the house and he took it. Knowing that there would be drugs in Defendant's bedroom, Son went into the bedroom, where Defendant was asleep with a woman Son did not know. Son "went straight to [a] drawer" in a bureau by Defendant's bed "[b]ecause [he] knew" that Defendant would have drugs there. Indeed, Son found marijuana in a container in the drawer and meth on a lid to a container that was in the drawer. He took both drugs with him. Son also looked inside the woman's purse, which was lying on the floor near the bed, and found marijuana, meth, and a meth pipe, all of which he took.

¶6     Son then took all of the drugs and drug paraphernalia back to his bedroom. Using the meth pipe from the woman's purse, Son smoked some of the meth. He then smoked some of the marijuana using the red mushroom pipe that Defendant's friend had given him earlier.

¶7     Later that day, February 7, 2012, Son walked to his nearby elementary school. He took the red mushroom pipe, a lighter, the remaining marijuana, and some tinfoil with him. Son smoked marijuana on his way to school, and once at school, he went into the second-grade bathroom and smoked marijuana again. Son was caught by a teacher when a second-grade boy smelled smoke in the bathroom and reported him. Police were called and they took Son to the hospital, where he tested positive for both meth and marijuana. While he was at the hospital, Son admitted to the police that he had gotten the drugs from his house.

¶8     When Defendant came to the hospital, he was questioned by the police. An officer noticed the smell of marijuana coming from Defendant and asked him about his drug use. Defendant admitted that he had just smoked marijuana and that he uses meth as well. Defendant also admitted that it was possible that Son had found both the meth and the marijuana in his home.

¶9     Defendant was charged with two counts of endangerment of a child and one count of obstructing justice. The information alleged that the charged conduct occurred "on or about February 7, 2012." Following a preliminary hearing, the obstruction-of-justice charge was dismissed, and the case proceeded to trial. At the close of the State's case-in-chief, Defendant moved for a directed verdict. Defendant argued that the State had not proved that Defendant "caused [or] permitted [Son] access to these drugs." *See* Utah Code Ann. § 76-5-112.5(2)(a). The trial court denied Defendant's motion, stating that "[b]ased on the evidence presented in the State's case in chief, I find that the State has met its burden and that there has been sufficient evidence presented from which a jury accurately and reasonably could convict the defendant." The trial court then submitted the case to the jury, which found Defendant guilty of both counts of child endangerment.[2]

¶10     After the verdict, but before sentencing, Defendant moved to arrest judgment, arguing that one of the State's witnesses at trial, a detective, had improper contact with the jury. Defendant's motion was accompanied by four signed affidavits from friends of Defendant who attended the trial. The affidavits alleged that the bailiff had called the detective to the jury room during jury deliberations to answer a question. The State opposed the motion and submitted the affidavit of an investigator from the Salt Lake County District Attorney's Office. The investigator's affidavit stated that he had talked with the detective, who denied ever speaking to any member of the jury. The detective stated that he went to a court clerk's work station through a door by the jury box to check whether Defendant had any outstanding warrants. The detective stated

---

2. The jury was instructed that "Count 1 pertains to the allegation of marijuana exposure, and Count 2 pertains to the allegation of methamphetamine exposure."

that this warrant check might have occurred during jury deliberations.

¶11    The investigator also spoke with the bailiff, who did not remember Defendant's case specifically but stated that he never allows anyone to speak with the jury as it deliberates. The trial court took judicial notice of the fact that the door the affiants saw the detective and the bailiff go through did not lead directly to the jury room but into a hallway. The trial court denied Defendant's motion to arrest judgment. The court ultimately sentenced Defendant to two concurrent prison terms of zero-to-five years. Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶12    First, Defendant contends that the trial court erred when it denied his motion for directed verdict. "A trial court's ruling on a motion for a directed verdict 'is a question of law[,] which we review for correctness[,] giving no particular deference to the trial court's legal conclusions.'" *State v. Hirschi*, 2007 UT App 255, ¶ 15, 167 P.3d 503 (alterations in original) (quoting *State v. Krueger*, 1999 UT App 54, ¶ 10, 975 P.2d 489).

¶13    Second, Defendant contends that the trial court erred in denying his motion to arrest judgment based on improper contact between the jury and a detective who testified during Defendant's trial. His apparent objective in having judgment arrested was to receive a new trial—the relief he specifically asks from us should we agree that the trial court erred in denying his motion. "We will disturb a trial court's factual findings underlying its decision to deny a motion for a new trial only if the findings are clearly erroneous." *State v. Burk*, 839 P.2d 880, 885 (Utah Ct. App. 1992). "As to the decision of whether to grant a new trial, a trial court has some discretion, and we reverse only for abuse of that discretion." *Id.* (citation and internal quotation

marks omitted). The same standard applies to our review of the denial of a motion to arrest judgment. *See id.*

ANALYSIS

I. Denial of Directed Verdict

¶14    Defendant first argues that the trial court erred in denying his motion for a directed verdict because "[n]o evidence supported the charge that [he] knowingly or intentionally caused or permitted [Son] to be exposed to drugs" under the child endangerment statute. *See* Utah Code Ann. § 76-5-112.5. Defendant's argument is primarily focused on whether he "caused or permitted" Son to be exposed to drugs. Defendant contends that "no evidence established that [he] consented expressly or formally to [Son] stealing from a houseguest's purse" and "no reasonable juror could have concluded that [Defendant] consented expressly or formally to [Son] being able to access drugs kept in a closed drawer in [Defendant]'s bedroom."

¶15    "Trial courts may deny a motion for directed verdict if the State has produced 'believable evidence of all the elements of the crime charged.'" *State v. Skousen*, 2012 UT App 325, ¶ 6, 290 P.3d 919 (quoting *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183). When a party challenges the denial of a motion for directed verdict alleging insufficiency of the evidence, "[w]e will uphold the trial court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Montoya*, 2004 UT 5, ¶ 29 (alteration in original) (citation and internal quotation marks omitted). "[I]f there is any evidence, however slight or circumstantial, which tends to show guilt of the crime charged or any of its degrees, it is the trial court's duty to submit the case to the jury." *Id.* ¶ 33

(alteration in original) (citation and internal quotation marks omitted).

¶16    The child endangerment statute provides that a person who "knowingly or intentionally causes or permits a child . . . to be exposed to, inhale, ingest, or have contact with a controlled substance, chemical substance, or drug paraphernalia" is guilty of a third degree felony. Utah Code Ann. § 76-5-112.5(2)(a). Thus, to survive Defendant's motion for directed verdict, the State was required to produce believable evidence that Defendant (1) knowingly or intentionally, (2) caused or permitted Son, (3) "to be exposed to, inhale, ingest, or have contact with a controlled substance, chemical substance, or drug paraphernalia." *See id.* After reviewing the evidence presented in this case, we conclude that there was sufficient evidence for the trial court to submit the case to the jury.

¶17    As a preliminary matter, we consider whether the trial court was bound by the definitions in the jury instructions in ruling on Defendant's motion for directed verdict. More specifically, we consider whether the definitions of "cause" and "permit" as set forth in the jury instructions were binding on the court as it considered Defendant's motion for directed verdict. The jury instructions defined "cause" as "to compel by command, authority, or force" and "permit" as "to consent to expressly or formally." The State contends that the jury-instruction definitions are irrelevant because Defendant is only contesting the trial court's denial of his motion for directed verdict and not the sufficiency of the evidence to support the jury's verdict under the instructions given.

¶18    We conclude that in considering Defendant's motion for directed verdict, the trial court was not bound by the jury-instruction definitions of "cause" and "permit." To begin with, in making his motion for a directed verdict, Defendant did not argue that the trial court was bound by the jury-instruction definitions. Nor had the instructions been given to the jury at

that point in time.[3] But in any event, in ruling on a motion for directed verdict, a trial court "may deny [the] motion . . . if the State has produced 'believable evidence of all the elements of the crime charged.'" *Skousen*, 2012 UT App 325, ¶ 6 (quoting *Montoya*, 2004 UT 5, ¶ 29). Thus, a trial court's directed-verdict inquiry is guided not by the jury instructions that will later be given to the jury, but by the elements of the crime as defined by the applicable law, i.e., the statutory provisions establishing and defining the offense. Consequently, even though the jury instructions had been discussed in a pretrial conference, and even if they were preliminarily or definitively approved, the trial court was not bound by the jury instructions in considering Defendant's motion for a directed verdict.

¶19    On appeal, "[w]e will uphold the trial court's decision [on a motion for directed verdict] if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Montoya*, 2004 UT 5, ¶ 29 (first

---

3. While it is undisputed that the jury instruction containing Defendant's definitions of "cause" and "permit" had not yet been read to the jury at the time of Defendant's motion for directed verdict, it is less clear whether the instruction had been conclusively approved by the trial court, because the pretrial discussion of the jury instructions was not transcribed and is not before us as part of the record on appeal. Indeed, it is unclear whether the pretrial discussion of the jury instructions was ever recorded in the first place. Hopefully it was. *See Briggs v. Holcomb*, 740 P.2d 281, 283 (Utah Ct. App. 1987) ("Although consistently making a record of all proceedings imposes a greater burden on the trial court and court reporters, it is impossible for an appellate court to review what may ultimately prove to be important proceedings when no record of them has been made.") (footnote omitted).

alteration in original) (citation and internal quotation marks omitted). Therefore, our inquiry on appeal is guided by the statutes establishing and defining the offense and not by the standards described in the jury instructions. *See United States v. Inman*, 558 F.3d 742, 748 (8th Cir. 2009) ("'[I]n determining whether a trial court has erred in denying a motion for a directed verdict made at the close of the evidence, it is the applicable law which is controlling, and not what the trial court announces the law to be in [its] instructions.'") (quoting *Coca Cola Bottling Co. of Black Hills v. Hubbard*, 203 F.2d 859, 862 (8th Cir. 1953)). Accordingly, in reviewing Defendant's challenge to the denial of his motion for directed verdict, we examine the evidence introduced at trial regarding whether Defendant endangered Son and compare it to the statutory elements of the offense as established in section 76-5-112.5 of the Utah Code.

¶20 We start by addressing the third element of the child endangerment statute—the "exposed to" portion. *See* Utah Code Ann. § 76-5-112.5(2)(a). In relevant part, the statute defines "exposed to" as "able to access or view an unlawfully possessed . . . controlled substance" or as "the reasonable capacity to access drug paraphernalia." *Id.* § 76-5-112.5(1)(e). In *State v. Gallegos*, 2007 UT 81, 171 P.3d 426, the Utah Supreme Court held that

> for a child to be exposed to . . . a controlled substance, chemical substance, or drug paraphernalia under the child endangerment statute, a real, physical risk of harm to the child must exist. In order for the risk to be real, the child must have a reasonable capacity to actually access or get to the substance or paraphernalia or to be subject to its harmful effects, such as by inhalation or touching.

*Id.* ¶ 11 (omission in original) (internal quotation marks omitted).

¶21 In this case, the State presented ample evidence that Son was "exposed to" meth and marijuana. To begin with, Son was consistently able to access drugs while he was living in Defendant's house. *See supra* ¶¶ 2–4. But more importantly, on the day in question—February 7, 2012—Son "actually access[ed]" meth and marijuana in Defendant's drawer and he inhaled or ingested both drugs. *See Gallegos*, 2007 UT 81, ¶ 11. Indeed, when the police took Son to the hospital, he tested positive for both meth and marijuana, and he admitted to the police that he had gotten the drugs from Defendant's house. Consequently, there is no real dispute as to whether Son was "exposed to" drugs. Thus, our resolution of this case turns on whether there was believable evidence that Defendant "knowingly or intentionally" "cause[d] or permit[ted]" Son's exposure to drugs. *See* Utah Code Ann. § 76-5-112.5(2)(a).

¶22 The Utah Code defines the terms "knowingly" and "intentionally." *See id.* § 76-2-103. A person acts "[k]nowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances." *Id.* § 76-2-103(2). Additionally, "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* A person acts "[i]ntentionally, or with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 76-2-103(1). At trial, both sides focused on whether Defendant acted knowingly, and on appeal, the State does not seriously assert that Defendant acted intentionally in this case. Accordingly, we only consider whether Defendant acted "knowingly."

¶23 The Utah Code does not define "cause" or "permit." Thus, we must determine the proper meaning of these terms as

used in the child endangerment statute.[4] "When interpreting statutory language, we presume that the Legislature used each word advisedly, and we give effect to each term according to its ordinary and accepted meaning." *State v. Terwilliger*, 1999 UT App 337, ¶ 10, 992 P.2d 490 (citation and internal quotation marks omitted).

¶24   *Webster's Third New International Dictionary* defines "cause" as to "bring into existence" or "to effect by command, authority, or force." *Webster's Third New Int'l Dictionary* 356 (1993). *Cf. State v. Wheeler*, 2005 UT App 255U, paras. 3, 5 (affirming the defendant's conviction for "knowingly caus[ing] or encourag[ing]" his son's delinquency where "[t]he evidence reflect[ed] that [the defendant] knew or should have known that by allowing the two separate visits [by his son] he caused or encouraged the son to violate [an] agreement with Youth Corrections").

¶25   Additionally, *Webster's* defines "permit" as "to consent to expressly or formally[, or to] grant leave for or the privilege of[, or to] allow, tolerate[;] . . . to give (a person) leave [or to]

---

4. We note that absent a statutorily mandated definition of a term, the definition that applies in any particular case is not carved in stone. "In determining the ordinary meaning of nontechnical terms of a statute, our starting point is the dictionary." *State v. Canton*, 2013 UT 44, ¶ 13, 308 P.3d 517 (citation and internal quotation marks omitted). But the dictionary "will often fail to dictate what meaning a word *must* bear in a particular context." *Id.* (emphasis in original) (citation and internal quotation marks omitted). Rather, the definition that applies in a particular context is often a function of the facts and surrounding circumstances. And opinions will often vary as to the best approach for ferreting out the legislatively intended meaning of statutory terms. *See, e.g., State v. Rasabout*, 2015 UT 72, 356 P.3d 1258.

authorize[;] . . . to make possible [or] to give an opportunity." *Webster's Third New Int'l Dictionary* 1683 (1993).[5] In *State v. Terwilliger*, 1999 UT App 337, 992 P.2d 490, this court determined that the term "permits" "suggests some measure of control or participation—in other words, active or knowing acquiescence." *Id.* ¶ 11.

¶26 In *Terwilliger*, the defendant, an eighteen-year-old adult minor, *see id.* ¶ 3 n.1, was charged with contributing to the delinquency of a minor and unlawful purchase, possession, or consumption of alcohol by a minor after police officers found him drinking with two minors under the age of eighteen. *See id.* ¶¶ 3, 5, 12. After a bench trial, the trial court found that the defendant "permit[ted] someone under the age of eighteen to consume an alcoholic beverage" and that he was guilty of both charges. *Id.* ¶ 5. The trial court "based its ruling on the fact that defendant simply witnessed two minors in his presence consuming alcohol." *Id.* ¶ 12.

¶27 On appeal, the defendant challenged the sufficiency of the evidence to support his conviction of contributing to the delinquency of a minor under section 78-3a-801 of the Utah Code.[6] *Id.* ¶ 1. More specifically, he argued that "the trial court

---

5. We acknowledge that *Webster's Third New International Dictionary* includes Defendant's argued-for definition of "permit," i.e., "to consent to expressly or formally." *Webster's Third New Int'l Dictionary* 1683 (1993). However, this definition is one of many and does not necessarily control.

6. Under section 78-3a-801 of the Utah Code, "[t]he court shall have concurrent jurisdiction to try . . . any person 18 years of age or older who . . . encourages or permits a minor to consume an alcoholic beverage or controlled substance." Utah Code Ann. § 78-3a-801(1)(d)(ii) (Michie 1996) (renumbered in 2008 as Utah Code Ann. § 78A-6-1001 (LexisNexis 2012)).

erred when it found that defendant's mere presence at the drinking party was tantamount to 'permitting' minors to consume alcohol, which the applicable statute prohibits." *Id.* ¶ 7.

¶28 This court concluded that the plain language of section 78-3a-801 did not support the prosecution or the conviction of the defendant, who had "merely see[n] others violate the law." *Id.* ¶ 12. Rather, the defendant had to have "*some measure of control* over the minors' consumption of alcohol." *Id.* (emphasis added). In *Terwilliger*, there was no evidence that the defendant and the minors had a relationship or that the defendant had provided the alcohol to the minors. *Id.* ¶¶ 3–4, 12. *Cf. State v. Wheeler*, 2005 UT App 255U, para. 4 (distinguishing *Terwilliger*, where the defendant "did not have a relationship or any prior involvement with the minor," from the case at hand, where the defendant was the minor's father, "thereby giving [him] greater control and understanding of the situation") (internal quotation marks omitted). Consequently, the *Terwilliger* court determined that the clear weight of the evidence did not support a finding that the defendant permitted minors to consume alcohol and vacated the defendant's conviction for contributing to the delinquency of a minor. *See* 1999 UT App 337, ¶ 13.

¶29 Although Defendant's requested definition of "permit" as "to consent to expressly or formally" is included in the dictionary, *see supra* ¶ 25 & n.5, we decline to adopt this definition because we do not think that such a narrow definition of the term is legislatively intended under the child endangerment statute. We agree with the *Terwilliger* court's interpretation of "permit" as requiring "some measure of control or participation—in other words, active or knowing acquiescence." *See Terwilliger*, 1999 UT App 337, ¶ 11. We therefore employ this definition in considering Defendant's appeal. In addition, we use the dictionary definition of the term "cause," along the lines employed in *Wheeler*. *See supra* ¶ 24. In light of these definitions, we next determine whether there was sufficient evidence to support a reasonable belief that Defendant

knowingly caused or permitted Son to be exposed to drugs. Defendant contends that he could not have knowingly caused or permitted Son to access the drugs in his drawer since he "was asleep because it was three or four in the morning." We disagree.

¶30    In this case, Son's actions on the morning of February 7, 2012, cannot be viewed in isolation. Defendant had created an atmosphere within his home in which drug use was open and prevalent. As previously discussed, Defendant sold drugs from his home, and he and his friends frequently used drugs in front of Son and left drugs and drug paraphernalia in plain view, where Son could easily access them. *See supra* ¶¶ 2–4. Defendant and his friends also discussed meth with Son and answered Son's questions about meth. Defendant frequently gave marijuana to Son. In general, Defendant countenanced a thriving drug culture within his home, and Son was continuously surrounded by and familiar with that culture.

¶31    Moreover, Defendant knew about Son's frequent drug use and continued to enable it. Son testified at trial that Defendant gave him marijuana "[t]wenty-five to 30 times," including on the night Son went into Defendant's bedroom to get drugs out of his drawer. Instead of discouraging Son's use of marijuana, Son testified that Defendant told him "not to get caught because I would get him in trouble and me in trouble . . . and he'd lose me." Although Defendant yelled at Son after he found out that Son had used meth, Defendant still allowed drug users to come into his house, and he did nothing to prohibit Son from accessing drugs within the house.

¶32    Finally, Defendant kept his drugs in a readily accessible place—an unlocked bureau drawer where Son knew Defendant kept his drugs. Son testified that when he went looking for drugs in the early morning hours of February 7, 2012, he "went straight to [Defendant's] drawer" because he "knew that [Defendant] would have [drugs] in his room" and that Defendant "keeps all of his pipes and stuff in his room." That same night, Son easily

found a meth pipe sitting on a counter in the front room of Defendant's house.

¶33 This evidence suggests that Defendant continuously kept drugs and drug paraphernalia in his house in places that were readily accessible to Son and that Son actually accessed drugs and drug paraphernalia on multiple occasions. Unlike the situation in *Terwilliger*, in which several young people showed up to a party to drink together, *see Terwilliger*, 1999 UT App 337, ¶¶ 3–4, Defendant and Son were in a parent–child relationship. Thus, Defendant had more than the requisite "some measure of control" over Son's exposure to drugs. *See id.* ¶ 12. As Son's father, and with Son being only ten years old, Defendant had *absolute* control over Son's exposure to drugs within his home. Defendant could have prevented his friends from using drugs within the home and from giving drugs to Son, he could have refrained from using drugs in the home, and he could have stopped giving Son drugs. At the very least, he could have physically secured any illegal drugs he brought into the home. Yet Defendant continuously and willfully allowed his friends to use drugs within the home, allowed Son to use marijuana within the home, provided Son with marijuana on multiple occasions, and left both marijuana and meth in an unlocked drawer where they were easily accessible.

¶34 Although Defendant did not give his express permission for Son to take the drugs from his drawer on the morning of February 7, 2012, Defendant had established an environment in which it was acceptable for Son to participate in the thriving drug culture Defendant promoted, and Defendant's sustained pattern of conduct sent a clear message to Son that Defendant "knowing[ly] acquiesc[ed]" in Son's use of and exposure to drugs, thereby "permitting" it for purposes of the statute. *See id.* ¶ 11. Furthermore, Defendant caused Son to be exposed to drugs—Defendant's sustained pattern of giving Son drugs and communicating to Son that it was okay for him to use marijuana, ultimately and unsurprisingly "br[ought] into existence" Son's

exposure to drugs on February 7, 2012, and on multiple other occasions. *See Webster's Third New Int'l Dictionary* 356 (1993) (defining "cause").

¶35   Based on the foregoing, we conclude that there was "some evidence . . . from which a reasonable jury could find," *see State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (citation and internal quotation marks omitted), that Defendant knowingly caused or permitted Son to be exposed to drugs as proscribed by the child endangerment statute, *see* Utah Code Ann. § 76-5-112.5. Defendant's "conduct [was] reasonably certain to cause the result" that Son would be exposed to drugs. *See id.* § 76-2-103(2) (defining "knowingly"). Moreover, Defendant's pattern of conduct relating to Son's drug use was sufficient to establish that he caused or permitted Son to be exposed to drugs. *See supra* ¶¶ 33–34; Utah Code Ann. § 76-5-112.5(1)(e). Consequently, we conclude that the State introduced sufficient evidence to prove that Defendant knowingly caused or permitted Son to be exposed to meth and marijuana.[7] The trial court did not err in denying Defendant's motion for directed verdict.

## II. Denial of Motion to Arrest Judgment

¶36   Defendant next argues that the trial court erred when it denied his motion to arrest judgment. Specifically, he contends that the trial court disregarded "persuasive evidence" of improper contact between a testifying detective and the jury.

---

7. If the child endangerment statute required intentional exposure, this would be a much closer case. However, the statute provides two different ways to satisfy the first element: either by knowingly exposing a child to drugs or intentionally exposing a child to drugs. *See* Utah Code Ann. § 76-5-112.5(2)(a) (LexisNexis 2012). The State's evidence need only satisfy one of the mens rea alternatives to survive a motion for a directed verdict, and it readily satisfied the "knowing" alternative.

¶37    In support of his motion to arrest judgment, Defendant submitted affidavits from four trial attendees, all of whom were Defendant's friends, each of which stated that the bailiff called a testifying detective to go to the jury room to answer a question for the jurors. In response, the State submitted an affidavit from an investigator with the Salt Lake County District Attorney's Office, who had interviewed both the detective and the bailiff. The detective told the investigator that "he had not spoken to any member of the jury in this case at any time." He also stated that he went "to one of the clerk's work stations with the bailiff to check the state record . . . to determine if [Defendant] had an outstanding warrant for his arrest" and that "this occurred before a verdict in the case and may have been during jury deliberations, but [he] was not sure of the timing." Although the bailiff was initially unsure to which case the investigator was referring, he ultimately told the investigator that he knew with "certainty" that "he did not allow anyone to speak to the jury as they deliberated" "because it would violate the rules of conduct and he has never allowed such activity in any case where he has had a jury in his charge." The bailiff also recalled using a clerk's work station to check for a warrant, but he did not recall if the detective was present.

¶38    After reviewing the parties' affidavits, the trial court asked whether either party wanted an evidentiary hearing on the matter:

> [Trial court]: And so I have received documents from both sides. Does any—do either party believe an evidentiary hearing or anything further is needed?
>
> [Prosecutor]: No, your Honor.
>
> [Defendant's trial counsel]: No, your Honor. The Court received the affidavits [I] submitted, I guess, two weeks ago?

> [Trial court]: Yes, I've reviewed all that and I've received from the State as well.

> [Defendant's trial counsel]: So I would submit it on the motion I filed as well as the affidavits.

¶39    Additionally, the trial court took judicial notice, without objection, to the fact that the door "near the jury box does not lead into a jury room; it leads into a hallway." The court then denied Defendant's motion, stating that

> [n]o witness testified that he or she witnessed any interaction between the jury and the witness but only by inference and speculation likely surmising that the door by the jury box leads directly into the jury room.

> There is no evidence of contact between the witness and the jury, only evidence that the witness utilized the same door that the jury had used. So here, no evidence of unauthorized conduct is present. The witnesses who had direct personal knowledge testified that no contact between the [detective] and the jury took place. The witnesses who have personal knowledge indicate that [the detective] did use the same door as the jury but that he did so to access a computer in the hallway directly outside of that door.

> So the Court finds that there's no evidence of improper jury contact that was made, and so there's no presumption [of] prejudice attaching to that and as such I'm denying the motion.

¶40    Utah courts "have long taken a strict approach in assuring that the constitutional guarantee of a fair trial not be compromised by improper contacts between jurors and

witnesses, attorneys, or court personnel." *State v. Pike*, 712 P.2d 277, 279 (Utah 1985). "The rule in this jurisdiction is that improper juror contact with witnesses or parties raises a rebuttable presumption of prejudice." *Id.* at 280. This presumption arises when there is any "unauthorized contact . . . which goes beyond a mere incidental, unintended, and brief contact." *Id.* Implicit in this approach is the idea that the presumption of prejudice attaches only after it is established that improper jury contact actually occurred. We conclude that the trial court's factual findings were supported by competent evidence and that the court did not abuse its discretion in denying Defendant's motion to arrest judgment.

¶41    In this case, Defendant's affiants did not actually witness a conversation between the detective and the jury; they merely witnessed the detective and the bailiff walk through the same door near the jury box, and they apparently assumed that the bailiff took the detective to the jury room. But, as the trial court judicially noticed, the door near the jury box did not lead directly into the jury room but into a hallway. Thus, Defendant's affidavits might have suggested the possibility of improper jury contact, but because of Defendant's assurance that an evidentiary hearing was unnecessary, neither the detective, the bailiff, nor any of the jurors were called to testify or were questioned by the trial court about the theorized improper contact. Moreover, the only witnesses directly involved—the detective and the bailiff—denied that any improper contact with the jury occurred, thus dispelling any inference of improper contact suggested by Defendant's affiants.

¶42    Because there was no direct evidence of improper contact between the detective and the jury, no presumption of prejudice arises in this case. Consequently, the trial court did not abuse its discretion by denying Defendant's motion to arrest judgment.

CONCLUSION

¶43    The trial court did not err when it denied Defendant's motion for directed verdict. Nor did the court abuse its discretion when it denied Defendant's motion to arrest judgment. Accordingly, Defendant's convictions are affirmed.

————