THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH WEISS, Defendant-Appellant.

First District (5th Division)    No. 1—92—2185

Opinion filed May 6, 1994.

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Ann Kidd, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County defendant was found guilty of four separate counts of criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(2) (now 720 ILCS 5/12—13(a)(2)(West 1992))) and sentenced to an extended-term of 20 years' imprisonment and a consecutive term of 15 years. On appeal, defendant contends that (1) the State failed to prove he had knowledge of the victim's inability to understand the nature of the act or to give knowing consent and (2) the sentence should be reduced. For the reasons which follow, we affirm the convictions of two counts of criminal sexual assault, order vacatur of two counts of criminal sexual assault, vacate the sentence and reverse and remand for re-sentencing with directions.

BACKGROUND

The record shows that defendant was charged in a multi-count indictment with aggravated criminal assault and criminal sexual assault. The trial court found that the evidence did not establish that the sexual assaults were committed in an aggravated manner, but thereafter found defendant guilty of criminal sexual assault under section 12—13(a)(2) of the Criminal Code. (Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(2) (now 720 ILCS 5/12—13(a)(2)(West 1992)).) Under

that section, criminal sexual assault occurs where one "commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent." Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(2) (now 720 ILCS 5/12—13(a)(2) (West 1992)).

In this case, the victim was a 34-year-old man, who, according to the expert testimony provided by the State, was mentally retarded and functioning at the level of a four-year-old child. This testimony particularly revealed that the victim was suffering from chronic disorganized schizophrenia and psychogenic polydipsia (an uncontrollable desire to consume liquids, especially water).

The record further shows that the incident giving rise to the charges against defendant occurred in the Winston Manor Nursing Home on the northside of Chicago. The home was described as a residential nursing facility which served both physically and mentally disabled persons. At the time of the offense, the victim lived on the second floor, which was reserved for severely mentally retarded patients. Defendant, who was recovering from broken legs and was in a wheelchair, resided on the fourth floor, which was reserved for those capable of independent living.

At trial, the State called the victim, L.C., as its first witness. He recalled living at the home and testified that he knew defendant. He would not, however, identify him at trial. He also stated that when he was living at the home "nothing happened," but acknowledged that he had told other people that something did happen. When asked to relate the conversation he had with the prosecutor concerning that incident, L.C. stated that he did not want to tell the judge about it and did not want to talk about it. L.C. then asked the court about the mask on his face. When the court told L.C. that he did not have a mask on his face, L.C. stated that he believed that he did, and no further questioning was attempted by either side.

Hubert Richardson testified that he was in the dining room of the facility about 11:30 p.m. on November 1, 1991, playing cards with S.R. White and Dominic Scudiero. He stated that defendant was also in the room at that time and was sitting on the opposite side drinking with Emma Shaw and Charles McClellan. At one point Richardson saw L.C., who was naked, run from behind the fish tank in the room. When defendant called him and L.C. went back to defendant, White left to seek help from the nursing staff. On cross-examination, Richardson stated that about five minutes before that, L.C. was clothed and he had approached the table where Richardson was playing cards and asked for a cigarette.

S.R. White testified that he was a resident in the facility in

question and was also in the dining room when this episode took place. He had left the card game to get a package of cigarettes from his room on the third floor, and when he returned he saw L.C. walking around naked. After making this observation he went to the second floor to alert the nurses.

Helen Halley, a certified nurse's aid working at Winston Manor on the night in question, testified that she knew L.C., whom she described as "somewhat like a child," and was present when White came to the nurse's station and talked to her and Mary Ousley. After that conversation, the two women descended the stairway and entered the dining room. Halley testified that she observed L.C. nude and sitting in defendant's lap; defendant was holding L.C. around the waist, rocking him up and down on top of him.

When she and Ousley entered the room defendant pushed L.C. off of his lap. At that point she saw defendant's erect penis sticking out of his pants. When defendant was confronted with the situation, he said something like "Oh, shit" and "L.C. wanted this to happen, he was begging for cigarettes." In her mind, defendant was angry. L.C., on the other hand, appeared frightened and was trembling. On cross-examination, she testified that L.C. talked to her, but that his conversation did not make much sense.

Halley also testified for the defense. She acknowledged that L.C. had asked her for cigarettes, but stated that he had not made any sexual comments or overtures to her, although she had heard him say things of this nature to Ousley. She also observed that when L.C. was in the dining room, he would pace back and forth and attempt to talk with other residents. On cross-examination Halley explained that L.C.'s conversation related to questions about food and activity in the room, but that his communication skills were not good and that he had difficulty conversing with people. She also explained that while the facility was divided into separate residential floors for the physically and mentally disabled, all residents shared a common area. The second floor housed those with mental problems.

Dominic Scudiero testified that he lived on the fourth floor of Winston Manor and between 10:30 and midnight on the night in question, he was in the dining room playing cards with White and Richardson. Defendant, McClellan and Shaw were also in the room drinking. L.C. entered the room and asked him and those at his table for a cigarette. They refused to give him any because the facility forbade giving him anything to smoke or drink. After that, L.C. walked over to defendant and asked him for a cigarette. Defendant said "I will give you a cigarette if you take off all your clothes." L.C. then took off his clothes and defendant and the other two people at

his table laughed. When L.C. asked if he could put his clothes on and indicated his fear, defendant told him not to worry because nothing would happen.

At this point Scudiero walked over to defendant and asked him why he would not let L.C. put his clothes on. Defendant responded that it was a joke, that they were only playing with him and that no one would get hurt. Scudiero then went back to his table and again heard L.C. ask if he could put his clothes on and telling defendant that he was afraid. Defendant said "Well, if you give me a blow job, I'll give you a pack of cigarettes." He then saw L.C.'s head go down into defendant's crotch and defendant unbuttoned his pants. He also saw defendant place his hands on top of L.C.'s head and L.C. moved up and down.

Scudiero then summoned the nurses on the second floor, and the three of them went down to the dining room. When they entered, Ousley yelled at defendant and asked him what was going on. Defendant pushed L.C. off of his lap, and Scudiero observed that L.C. was totally naked, that defendant's penis was erect and that his pants were unbuttoned and zipped down. When defendant started to zip up his pants, he said "I don't care. I don't give a shit. I been there before." Meanwhile L.C. went over and stood by the piano where he cried and shook badly; Scudiero found him obviously upset about the incident. On cross-examination Scudiero stated that the rule about not giving L.C. any liquid or cigarettes was related to a medical condition which caused convulsions. He also stated that he was so upset by defendant's behavior with L.C. that he fetched the nurses.

Mary Ousley testified that she worked at Winston Manor as a certified nurse's assistant and described the layout of the facility in the manner stated by the other witnesses. She also related her familiarity with defendant and L.C. and explained that the limits on L.C.'s liquid intake and smoking of cigarettes were derived from his medical records, which showed him to be schizophrenic and suffering from polydipsia.

Ousley further testified that after White conversed with her and Halley at the nursing station on the second floor, they went downstairs to investigate. When they got there, she saw defendant, Chuck and Emma at a table. Defendant was in his wheelchair, and L.C., who was completely nude, was on top of him with his back towards defendant's face. Defendant had his hands on L.C.'s hips and was pushing him up and down as the other people at his table cheered him on. When she asked defendant what was going on, he pushed L.C. off of his lap. She then told defendant that she was going to have to report this incident and he responded, "I don't give a damn. I been

in prison before. What else is new?" He laughed as if it was a joke, and she told L.C., who was crying and shaking, to put his clothes back on.

She then took L.C. up to his room, where he sat on his bed rocking back and forth, crying and talking about how this had destroyed him. When he was summoned downstairs, L.C. got up, and Ousley observed blood on the bed, revealing that he had been physically hurt.

On cross-examination Ousley stated that she did not know how much actual previous personal contact defendant had with L.C., but asserted that defendant was very aware of L.C.'s condition, as he was of everyone else's condition. She also stated that the facility director had informed the residents that L.C. was not to be given liquids or cigarettes, and that L.C. had never made any sexual comments to her.

The State's final witness was Dr. Lesley Blake, a psychiatrist. She testified that L.C. was currently a patient at the Illinois State Psychiatric Institute, where she was on staff, that she supervised the staff who treated him, and that she saw him personally in weekly meetings. She testified that L.C. suffered from chronic disorganized schizophrenia and psychogenic polydipsia. She revealed that his I.Q. was recently tested at 53, although he had tested as high as 65, that it is difficult for him to function and that this situation is aggravated by his schizophrenia. She stated that the cumulative effect of these conditions is that L.C. needs constant supervision for he is functioning at the level of a 50-month-old child and has shown poor judgment. She also explained that the description of L.C.'s condition as chronic means that he has had this condition for at least two years.

After the court entered directed findings on two counts of the indictment, defendant rested without presenting any additional evidence. The court then found him guilty of criminal sexual assault, as charged, for the remaining counts and sentenced defendant to an extended term of 20 years' imprisonment and a consecutive term of 15 years. Defendant appeals.

I

OPINION

In this appeal defendant contends that he was not proved guilty of these offenses beyond a reasonable doubt because the State failed to affirmatively establish that defendant knew of anything which rendered L.C. unable to understand or consent to these acts. We disagree.

When challenged with a claim of insufficiency of evidence, it is

the function of the reviewing court to examine the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) This standard applies to all criminal cases regardless of the nature of the evidence (*People v. Schott* (1991), 145 Ill. 2d 188, 203, 582 N.E.2d 690), and a criminal conviction will not be overturned on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. *Collins*, 106 Ill. 2d at 261.

The evidence in this case clearly established acts of fellatio and anal penetration to satisfy the element of sexual penetration. However, to sustain the convictions entered, the evidence must also establish the mental state of knowledge. (Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(2) (now 720 ILCS 5/12—13(a)(2) (West 1992)); *People v. Pinta* (1991), 210 Ill. App. 3d 1071, 1078, 569 N.E.2d 1255.) Knowledge generally refers to an awareness of the existence of facts which make an individual's conduct unlawful (*People v. Gean* (1991), 143 Ill. 2d 281, 288, 573 N.E.2d 818) and has been statutorily defined in pertinent part, as follows:

"A person knows, or acts knowingly or with knowledge of:

(a) The nature of attendant circumstances of his conduct, described by the statute defining the offense, when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists." Ill. Rev. Stat. 1991, ch. 38, par. 4—5 (now 720 ILCS 5/4—5 (West 1992)).

Because of its very nature, this mental element is ordinarily established by circumstantial evidence, rather than by direct proof. (*People v. Farrokhi* (1980), 91 Ill. App. 3d 421, 427, 414 N.E.2d 921.) The State must present sufficient evidence from which an inference of knowledge can be made, and any inference must be based on established facts and not pyramided on intervening inferences. *Pinta*, 210 Ill. App. 3d at 1078.

Defendant here maintains that the State has not presented either direct or legally sufficient inferential evidence of the element of knowledge to sustain its burden. He claims that L.C.'s testimony that "nothing happened" supports the conclusion that the sexual acts in which L.C. engaged were not unknown to him, and gave defendant no reason to believe that L.C. did not know what he was doing or give his consent to it. He further maintains that evidence of staff warnings to other residents that L.C. was not to be given anything to drink or smoke cannot be imputed to him, and that other circum-

stances, such as the fact that L.C. was not restrained and commingled with the other residents and that he had recently arrived at the facility and his demeanor was presumptively competent to one who did not have access to his medical file, also demonstrate the State's failure to prove defendant's actual, conscious awareness of L.C.'s limitations to establish the element of knowledge. We disagree.

■ A review of the record under the mandated standard shows ample evidence from which a rational trier of fact could have found the element of knowledge proved to the requisite level. The personality and limitations of L.C. virtually leap out of the pages of this record and were verbalized by the trial court in the remarks made at sentencing. The court stated in pertinent part:

> "[T]o do what you did to a baby, that is the only way we can characterize the poor victim in this case, his—he is—I mean I saw the man testify, and he is not a man, he is a little boy."

The court drew this conclusion after personally observing L.C. briefly as a witness. In addition, L.C.'s condition was defined by the psychiatrist who later testified and was borne out in the testimony of the other residents. They testified to the makeup of the facility and their awareness that L.C. resided on the floor set aside for mental patients. The testimony of the staff and these residents also showed that L.C. had poor communicative skills, that he did not engage in any meaningful conversation with others, and that two residents were prompted to immediately summon help when they observed defendant taking advantage of L.C., while defendant and his companions laughed at L.C.'s expense. The ability of defendant to discern L.C.'s situation may be inferred from the cognitive powers attributed to defendant by Mary Ousley and is supported by the prowess defendant demonstrated in his dealings with L.C. that evening as described by the eyewitnesses who testified. Accordingly, we find more than sufficient evidence in the record to satisfy the element of defendant's knowledge.

Moreover, although L.C. might have understood the physical nature of the sexual activity in which he engaged that evening, this fact does not prove that he was able to understand the social and personal cost of the act; and this inability, combined with the other testimony showing his mental deficiencies, was sufficient to establish that L.C. was incapable of understanding the acts or of giving knowing consent. (See *People v. McMullen* (1980), 91 Ill. App. 3d 184, 189-90, 414 N.E.2d 214.) On this basis, we distinguish *People v. Blunt* (1965), 65 Ill. App. 2d 268, 212 N.E.2d 719, cited by defendant in support of his case. See the discussion of this point in *People v. Velasco* (1991), 216 Ill. App. 3d 578, 587-88, 575 N.E.2d 954, and *People v. Maloney* (1990), 201 Ill. App. 3d 599, 611-12, 558 N.E.2d 1277.

In sum, we find L.C.'s condition to be transparent even on this cold record, and defendant's appreciation of his vulnerability, due to these visible limitations, was exhibited in the jocular and patronizing manner in which defendant visited himself upon L.C. that evening with the promise of a package of cigarettes.

## II

In this appeal, the appellant initially presented brief and argument which only addressed the sufficiency of the evidence to support the judgment of the trial court finding the defendant guilty of criminal sexual assault as charged. We initially issued an Illinois Supreme Court Rule 23 order (134 Ill. 2d R. 23) affirming the judgment and addressed no other issues. Appellant filed a timely petition for rehearing contending that only one conviction can stand for each act and requesting that his sentence be reduced. The State responded by contending that defendant waived his right to raise this issue on appeal by not objecting at the sentencing hearing or filing a motion to reduce his sentence, and by raising the issue for the first time after this court rendered an opinion in this matter. We disagree.

The four counts charging the defendant with criminal sexual assault are as follows:

| "Count III | Contact between Joseph Weiss' penis and L.C.'s mouth, and he knew that L.C. was unable to understand the nature of the act. |
| | \* \* \* |
| Count IV | Contact between Joseph Weiss' penis and L.C.'s anus, and he knew that L.C. was unable to understand the nature of the act. |
| | \* \* \* |
| Count V | Contact between Joseph Weiss' penis and L.C.'s mouth, and he knew that L.C. was unable to give knowing consent. |
| | \* \* \* |
| Count VI | Contact between Joseph Weiss' penis and L.C.'s anus, and he knew that L.C. was unable to give knowing consent." |

The trial judge sentenced defendant to 20 years for the first two criminal sexual assault offenses and sentenced defendant consecutively to 15 years for second two criminal sexual assault offenses.

■ There were only two physical acts and we hold that only one conviction can stand for each of the two physical acts. We also hold that the sentence is excessive.

Illinois Supreme Court Rules 615(a) and (b)(4) (134 Ill. 2d Rules 615(a), (b)(4)) empower the appellate court to "review any criminal sentence even though the issue is not raised on appeal." (*People v. White* (1972), 5 Ill. App. 3d 205, 207, 282 N.E.2d 467; accord *People v. Giles* (1991), 209 Ill. App. 3d 265, 273, 568 N.E.2d 116.) Rule 615 (b)(4) provides that on appeal the reviewing court may "reduce the punishment imposed by the trial court." 134 Ill. 2d R. 615(b)(4).

Relative to defendant's contention that only one conviction can stand for each act in this case, we find *People v. Calva* (1993), 256 Ill. App. 3d 865, to be apposite. In *Calva*, the defendant entered a "blind plea" to six counts of aggravated criminal sexual assault on a six-year-old girl and was sentenced to an extended term of 40 years' imprisonment. All six convictions were based upon three acts of penetration which occurred on the same day. After determining, first, that three of Calva's convictions had to be vacated because each act resulted in two convictions, and, second, that there was sufficient factual basis for the convictions, the reviewing court went on to consider whether Calva's sentence should be reduced.

Addressing the aggravated criminal sexual assaults of which the *Calva* defendant stood convicted, the court observed:

> "While the threshold elements of the offenses committed by defendant are gravely serious in nature and deserving of strong punishment, those elements were considered by the legislature in setting the permissible range of penalties for the crime. (See *People v. White* (1986), 114 Ill. 2d 61, 66, 499 N.E.2d 467 (age of victim considered in setting statutory range of penalties for aggravated battery of a child).)" *Calva*, 256 Ill. App. 3d at 874.

Like Joseph Weiss, the *Calva* defendant stood convicted twice on each alleged sexual act. In *Calva* two convictions were entered for each vaginal, anal and oral penetration, the difference in the charges being that one sequence alleged the victim was under 13 years of age and the accused was over 17 (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1) (now 720 ILCS 5/12—14 (b)(1)(West 1992))), while another set of charges derived from a different subsection and alleged that the defendant used force and caused bodily harm (Ill. Rev. Stat. 1989, ch. 38, pars. 12—14(a)(1), (a)(2) (now 720 ILCS 5/12—14(a)(1), (2) (West 1992))). (*Calva*, 256 Ill. App. 3d at 874, 876.) Since only one conviction could stand for each physical act, the court remanded with directions that the lower court determine which three of the convictions should stand. *Calva*, 256 Ill. App. 3d at 874-76.

The case against Joseph Weiss proved two acts of penetration: one oral followed by one anal act. Yet he was convicted twice for

each act: once on allegations that he knew the victim was unable to understand the nature of the act and once on allegations that he knew the victim was unable to give knowing consent to the act. Where in *Calva* the duplicative convictions arose from multiple charges for the same act under different statutory sections, here the duplicative convictions all arose under the identical statutory section of the Criminal Code: 12—13(a)(2). Since the defendant has been convicted twice on each sexual act, one conviction on each sexual act must be vacated.

▮ Further, we agree with appellant that the sentence is excessive. Although the elements of the crimes committed in this case are offensive, the legislature has considered those elements in setting the permissible range of penalties. Unless an extended term should be imposed, the legislature has determined that a Class 1 felony offense warrants punishment by imprisonment in the range of 4 to 15 years. Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(4) (now 730 ILCS 5/5—8—1(a)(4)(West 1992)).

The case of *People v. Neither* (1992), 230 Ill. App. 3d 546, 595 N.E.2d 124, provides some statistical data usable for comparisons in sentencing Class 1 felons. In *Neither*, the reviewing court reduced aggregate Class 1 sentences of 71 years to an aggregate 15 years even though the reviewing court concluded that defendants had exhibited callous disregard for their four victims whose age (over 60) and weakness made them attractive prey. (*Neither*, 230 Ill. App. 3d at 550-52.) In *Neither*, the reviewing court wrote:

"According to the Illinois Department of Corrections 1988 Statistical Presentation (IDOC report) that was published under this provision, during the six-year period from 1983 to 1988, Class 1 felonies carried average prison terms of slightly over six years. *** The shortest sentences imposed were four years and the longest were 15 years." *Neither*, 230 Ill. App. 3d at 551.

Relative to the case at bar, we are mindful that the Unified Code of Corrections provides that "[t]he court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless *** the defendant was convicted of a violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—4(a) (now 730 ILCS 5/5—8—4 (West 1992)).) So, in this case, the trial court imposed a consecutive sentence against the defendant pursuant to this section.

However, although consecutive sentences are authorized, the

statistical data regarding sentences for Class 1 felonies reported by the reviewing court in *Neither* indicate that the sentence in this case is excessive. Our opinion is reinforced by other cases: *People v. Mitchell* (1993), 155 Ill. 2d 344, 614 N.E.2d 1213 (12 years' imprisonment for aggravated criminal sexual assault), and *People v. Coleman* (1991), 222 Ill. App. 3d 614, 584 N.E.2d 330 (20-year term imposed on aggravated criminal sexual assault). This analysis establishes that, in the case at bar, a sentence, including any consecutive sentence, which exceeds 15 years amounts to an excessive sentence. Therefore, the sentence is vacated, the case is reversed and the trial court is directed to vacate two counts of criminal sexual assault and resentence the defendant in conformance with this opinion.

Affirmed in part; vacated and reversed in part and remanded with directions.

MURRAY, P.J., and GORDON, J., concur.