2021 IL App (3d) 190366

Opinion filed May 26, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellee, | ) | Kankakee County, Illinois. |
| | ) | |
| | ) | Appeal No. 3-19-0366 |
| v. | ) | Circuit No. 18-CM-172 |
| | ) | |
| | ) | The Honorable |
| JACOB PENNING, | ) | Clark E. Erickson, |
| | ) | Judge, Presiding. |
| Defendant-Appellant. | ) | |

_____

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices Daugherity and Schmidt concurred in the judgment and opinion.

_____

**OPINION**

¶ 1      Defendant was charged with two counts of endangering the life or health of a child (720 ILCS 5/12C-5(a)(1), (2) (West 2018)) when he overdosed on heroin while a five-year-old child, B.L., was in his care and custody. The trial court found defendant guilty, sentenced him to 18 months of probation, and ordered him to complete drug treatment. Defendant appeals his conviction. We affirm.

I. BACKGROUND

¶ 3     In April 2018, defendant was charged by information with two counts of endangering the life or health of a child. Count I alleged that defendant "did cause or permit the life or health of a child under the age of 18, being B.L., to be endangered." Count II alleged that defendant "did knowingly cause or permit a child, being B.L., to be placed in circumstances that endanger the child's life or health." Defendant waived his right to a jury trial, and the case proceeded to a bench trial.

¶ 4     The parties stipulated to the admission of a report written by Officer L. Arsenau. Arsenau stated that he reported to an apartment on February 17, 2018, at approximately 8:26 p.m. "for a possible overdose." When Arsenau arrived, he was greeted by Joseph Shepherd, who told him defendant was "in the bathroom laying on the floor unconscious." While walking through the living room of the apartment, Arsenau noticed "a small child [B.L.] *** who was sitting on the edge of the couch closest to the bathroom." When Arsenau reached the bathroom, he found defendant laying on the floor, barely breathing, with blood on his nose and blood coming from both nostrils.

¶ 5     Paramedics arrived and administered to defendant one dose of Narcan, which was not effective. Paramedics then cut off defendant's shirt and sweatshirt, placed a monitor on his chest, and gave him a second dose of Narcan intravenously. Approximately five minutes later, defendant started to regain consciousness. Upon regaining consciousness, defendant "started to become combative towards the paramedics" and had to be "physically restrained until he calmed down."

¶ 6     When defendant calmed down and sat up, the paramedics found a small red bag containing a white powdery substance and a syringe on the bathroom floor. Paramedics placed defendant on a stretcher and carried him out of the apartment building. Before he was placed in an ambulance,

an officer searched defendant's pants pockets and found "a bag that contained a green leafy substance and a syringe."

¶ 7 Upon searching the bathroom, Arsenau found "a sandwich sized bag with multiple small red bags filled with the same white powdery substance that was in the small red bag found where [defendant] was laying in the bathroom." In the bathroom, Arsenau also "located multiple open bags of medical equipment such as a bag for syringes and a latex band." After completing his search of the bathroom "for anything that might cause harm to [B.L.]," Arsenau and another officer went outside to talk to Shepherd, who had B.L. with him. Shepherd told Arsenau he was going to take B.L. to the hospital.

¶ 8 At the hospital, defendant told Arsenau that B.L. was Amanda's child and that he was watching him for the night while she was at work. When Arsenau asked defendant for Amanda's contact information, defendant "failed to cooperate."

¶ 9 Amanda L. testified that she and defendant share a son, B.L., who is five years old. On February 17, 2018, at around 8 or 9 p.m., defendant began watching B.L. at Amanda's apartment. When Amanda left her apartment, the only people there were defendant and B.L. According to Amanda, no one else was supposed to be at her apartment.

¶ 10 Amanda knew that defendant had used drugs in the past, but he told her "he was clean." Amanda normally worked from midnight until 8 a.m., but she left work early on February 18, 2018, after receiving a phone call from her mother telling her that B.L. was in protective custody with the Department of Children and Family Services (DCFS). DCFS called Amanda's mother because defendant would not give DCFS Amanda's contact information. B.L. was not actually in protective custody but was with defendant when Amanda left work. When Amanda asked

3

defendant what happened, he told her "he got dehydrated and he passed out." He denied overdosing.

¶ 11 Defendant testified that he began dating Amanda in December 2017, but admitted he had a short relationship with her several years earlier and that B.L. was "possibly" his son. On February 17, 2018, Amanda had to work, so defendant agreed to watch B.L. After dropping off Amanda at work that evening, defendant picked up his half-brother, Shepherd, and took him back to Amanda's apartment with him and B.L. The three of them watched movies for a "little while." When it was "getting late," defendant put a movie on for B.L. in his bedroom.

¶ 12 After that, defendant called someone to purchase heroin. Defendant met the seller "down the street." Upon returning to the apartment, defendant went into the bathroom, locked the door, and injected the heroin. After that, defendant blacked out. When he regained consciousness, there were paramedics around him, and he was taken to the hospital. Shepherd later came to the hospital with B.L.

¶ 13 While defendant was in the bathroom using heroin, Shepherd was in the living room watching T.V., and B.L. was in his bed watching a movie. Defendant admitted he had drugs and drug paraphernalia, including at least one syringe, in the bathroom with him.

¶ 14 The trial judge found defendant guilty of child endangerment, stating that defendant "in choosing to go into the bathroom and take heroin ***, which carries with it a known risk of overdose, was endangering the health of his child." The trial court rejected defendant's argument that B.L. was never in danger because Shepherd was present at all times, stating, "Joseph Shepherd just happened to be there. Joseph Shepherd was under no obligation to remain there and watch the child." The trial court sentenced defendant to 18 months of probation and ordered him to complete drug treatment. Defendant filed a motion to reconsider, which the court denied.

4

¶ 15                                    II. ANALYSIS

¶ 16         Defendant appeals his conviction, arguing that the evidence was insufficient to prove him

guilty of endangering the life or health of a child.

¶ 17         "In reviewing the sufficiency of the evidence, the question is whether, after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v.*

*Jordan*, 218 Ill. 2d 255, 269 (2006).

¶ 18          The Criminal Code of 2012 (Code) provides:

> "A person commits endangering the life or health of a child when he or she knowingly:
>
> (1) causes or permits the life or health of a child under the age of 18 to be endangered; or
>
> (2) causes or permits a child to be placed in circumstances that endanger the child's life or
>
> health." 720 ILCS 5/12C-5(a) (West 2018).

When a defendant is charged in the alternative with child endangerment under both subsections

(1) and (2), evidence of an actual injury is not required. See *People v. Melton*, 282 Ill. App. 3d

408, 417 (1996); *People v. Wilkenson*, 262 Ill. App. 3d 869, 874-75 (1994). "[B]y its plain

meaning, the term [endanger] refers to a potential or possibility of injury." *People v. Collins*, 214

Ill. 2d 206, 215 (2005). "The term does not refer to conduct that will result or actually results in

harm, but rather to conduct that could or might result in harm." *Id.*

¶ 19         "A person is said to act knowingly when he is consciously aware that his conduct is

practically certain to cause the offense defined in the statute." *Melton*, 282 Ill. App. 3d at 417.

Knowledge, by its very nature, is ordinarily proven through circumstantial evidence, rather than

direct proof. *Id.* The State must present sufficient evidence from which an inference of knowledge

can be made. *Id.* (citing *People v. Weiss*, 263 Ill. App. 3d 725, 731 (1994)). The defendant need

5

not admit knowledge for the trier of fact to conclude that he acted knowingly. *Id.* at 417-18 (citing *People v. Rader*, 272 Ill. App. 3d 796, 806 (1995)).

¶ 20    In *Jordan*, 218 Ill. 2d at 259, the State charged the defendant with endangering the life and health of a child when he " 'knowingly and without legal justification left his child *** unattended in a motor vehicle with an outside temperature of 22° and a windchill of 12° for approximately one hour." At the time, the Code contained "a rebuttable presumption that a person committed the offense if he or she left a child 6 years of age or younger unattended in a motor vehicle for more than 10 minutes." 720 ILCS 5/12-21.6(b) (West 2002). Our supreme court found that presumption unconstitutional. *Jordan*, 218 Ill. 2d at 266.

¶ 21    Nevertheless, the supreme court affirmed the defendant's conviction, finding that

"a rational trier of fact could have found that defendant knowingly endangered his infant daughter's life or health by leaving her unattended in his vehicle, taking into account the setting where defendant's vehicle was parked, the weather conditions, and the amount of time defendant left his daughter alone in the vehicle." *Id.* at 272.

The court explained:

"[I]t is an unfortunate fact of modern urban life that the more populated the area, the greater the likelihood that some ill will befall a young child who is left unattended in a public place. A young child unattended in a public setting is easy prey for social predators who may happen by. Legal reporters in our law libraries are rife with tragic examples confirming this observation. The danger is no less real because the actual occurrence of such an incident is a random event. *** [L]eaving a child unattended in a public place exposes the child to the danger posed by those in our society who may harm the child. We believe that too is a matter of common

6

sense. It should also be obvious that the more populated the environment, and the longer the time the child is left alone, the greater the exposure to that danger.

In this case, the witnesses all testified that the parking lot in question was a public lot adjacent to the college. Defendant himself described the location as a 'pretty big lot.' It follows that there would be a significant number of people in the general vicinity of the unattended child. Given the circumstances, we believe a rational trier of fact might well have found that defendant knowingly endangered his daughter by leaving her unattended for as long as 40 minutes in a public place, thus exposing her to unacceptable risks of harm from passersby." *Id.* at 271-72.

The supreme court focused on the totality of the circumstances in determining that the evidence was sufficient to support defendant's conviction of child endangerment. See *id.*

¶ 22    In *Wilkenson*, 262 Ill. App. 3d at 871-72, the State charged the defendant with child endangerment for holding a butter knife with a three-to-four-inch blade to the throat of her seven-month-old baby. The defendant claimed that "merely holding a butter knife to the child did not endanger her life since the statute requires an actual injury." *Id.* at 874. The appellate court disagreed, stating that "endangering the life of a child involves placing the child's life into danger of probable physical or mental damage" but does not require "actually damaging, harming, or hurting that child's health." *Id.* at 874-75. The court ruled that the defendant was proven guilty beyond a reasonable doubt of child endangerment because holding a knife to the throat of a child is the "type of conduct *** clearly proscribed in the statute." *Id.* at 875-76.

¶ 23    In *Melton*, 282 Ill. App. 3d at 411, five codefendants resided in an apartment in Chicago with their 19 children, ranging in age from 17 months to 14 years old. In the living and dining rooms, witnesses observed children clothed in only dirty underwear or dirty diapers, sleeping on

7

two bare, filthy mattresses, sharing a few dirty blankets crawling with cockroaches and one dirty, stained pillow. *Id* at 412. The kitchen was covered with garbage and infested with cockroaches. *Id.* Additionally, there were "piles of dirty, damp and crusty clothes all over the apartment." *Id.* The appellate court ruled that the evidence was sufficient to establish the defendants committed child endangerment when they "made a 'conscious choice' to live in conditions which the trial court stated were not even fit for animals, and to expose the children to these conditions, as well." *Id.* at 418. The court stated: "Based on the graphic testimonial and photographic evidence presented at trial, a trier of fact could reasonably infer that the defendants willfully caused or permitted their children's lives or health to be endangered, or to be placed in circumstances that endangered their lives or health." *Id.*

¶ 24        Finally, in *People v. Belknap*, 396 Ill. App. 3d 183, 204 (2009), the defendant was charged with causing or permitting a child to be placed in circumstances that endangered her life or health when he used illegal narcotics and failed to provide necessary care and medical attention to the child in his care. Evidence showed that the defendant had been taking methamphetamines and not sleeping for several days when he hit the child in the head four or five times, causing bleeding and swelling in her brain, leading to her death. *Id.* The court concluded that, under the circumstances, "the evidence was sufficient to prove the defendant guilty of endangering the life or health of a child." *Id.*

¶ 25        Here, a reasonable trier of fact could have found that defendant knowingly caused B.L. to be placed in circumstances that endangered his life or health when he made a conscious choice to inject heroin while he was caring for B.L. Using heroin while a child is in one's care exposes the child to inherent danger in many ways. See *Jones v. State*, 2016-KA-01305-COA (¶ 20) (Miss. 2018), including (1) neglect of the child by the drug-using caregiver (see *White v. State*, 547

8

N.E.2d 831, 836 (Ind. 1989)), (2) an increased likelihood that the child will try drugs (see *id.*; *State v. Bossert*, 2015 UT App 275, ¶¶ 31-35, 362 P.3d 1258; (3) giving a child access to illegal drugs (see *Carosi v. Commonwealth*, 701 S.E.2d 441, 446-47 (Va. 2010)), (4) violent behavior by the drug user (see *Belknap*, 396 Ill. App. 3d at 204), (5) loss of consciousness by the drug user (see *Meza v. State*, 549 S.W.3d 672, 687 (Tex. Crim. App. 2017)), (6) impaired driving by the drug user (see *In re B.G.W.*, 154 P.3d 148, 158 (Or. Ct. App. 2007) (causing a "rollover car accident")), and (7) ingestion of drugs by a child (see *Bossert*, 2015 UT App 275, ¶¶ 31-35).

¶ 26        Defendant argues, as he did in the trial court, that he did not endanger B.L. because Shepherd was with B.L. at all times. We disagree. First, as the trial court stated, Shepherd was not B.L.'s caregiver and was under no obligation to remain with B.L. Amanda testified that she did not give anyone other than defendant permission to be in her apartment with B.L. She did not ask Shepherd to care for or supervise her child. Furthermore, Shepherd's presence could not eliminate all the dangers resulting from defendant's drug use.

¶ 27        Illegal drug use by a parent or caregiver supports the conclusion that a child's physical and emotional well-being is endangered. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App. 2003) (citing *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App. 1998)). "[T]he illegal use of drugs *** has been found to endanger children when done in their presence." *Bean v. State*, 818 N.E.2d 148, 151 n.3 (Ind. Ct. App. 2004). "[E]xposure of a dependent to an environment of illegal drug use poses an actual and appreciable danger to that dependent and thereby constitutes neglect ***." *White*, 547 N.E.2d at 836. A parent's drug use can affect his or her ability to parent, as well as a child's safety and wellbeing. See *B.G.W.*, 154 P.3d at 158.

¶ 28        Caregivers have been found guilty of child endangerment when they possess or allow someone else to possess illegal drugs in a home where children are present. See *Carosi*, 701 S.E.2d

9

at 447-48 (caregiver guilty of child endangerment where she knowingly permitted child to be present in home where illegal drugs were kept unsecured in area accessible to child); *State v. Perry*, 725 N.W.2d 761, 766 (Minn. Ct. App. 2007) (grandmother guilty of child endangerment where she permitted grandchildren to remain in home where daughter possessed and sold drugs). "[O]ne 'endangers a child's person or health by knowingly causing or permitting the child to be present' with *** drugs." *Jones*, 2016-KA-01305-COA (¶ 20) (Miss. 2018) (quoting Miss. Code Ann. § 97-5-39(4)(a) (2014)).

¶ 29    Here, defendant possessed heroin in close vicinity to B.L. and used it while B.L. was in his care and custody. Defendant overdosed, leaving B.L. without his appointed caregiver. When an officer and paramedics arrived, they found B.L. sitting on the couch near the bathroom where defendant was laying with blood on his face and barely breathing. Also in the bathroom were several bags of drugs and syringes. When the first dose of Narcan did not revive defendant, paramedics had to cut off defendant's clothes, place a monitor on his chest, and provide defendant Narcan intravenously. When defendant came to, he was combative and had to be restrained before being placed on a stretcher and carried out of the apartment building.

¶ 30    Based on the totality of these circumstances, it was reasonable for the trier of fact to conclude that defendant knowingly caused B.L. to be placed in circumstances that endangered his life or health.

¶ 31                                    III. CONCLUSION

¶ 32    For the foregoing reasons, the judgment of the circuit court of Kankakee County is affirmed.

¶ 33    Affirmed.

**No. 3-19-0366**

<table>
<tr><td>**Cite as:**</td><td>*People v. Penning*, 2021 IL App (3d) 190366</td></tr>
<tr><td>**Decision Under Review:**</td><td>Appeal from the Circuit Court of Kankakee County, No. 18-CM-172; the Hon. Clark Erickson, Judge, presiding.</td></tr>
<tr><td>**Attorneys<br>for<br>Appellant:**</td><td>James E. Chadd, Thomas A. Karalis, and Adam N. Weaver, of State Appellate Defender's Office, of Ottawa, for appellant.</td></tr>
<tr><td>**Attorneys<br>for<br>Appellee:**</td><td>Jim Rowe, State's Attorney, of Kankakee (Patrick Delfino, Thomas D. Arado, and Korin I. Navarro, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.</td></tr>
</table>