2021 IL App (2d) 200185-U
No. 2-20-0185
Order filed November 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-866 |
| STEPHANIE A. LARSON, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1  *Held*: The jury properly convicted defendant of endangering the life of her one-year-old child where a rational trier of fact could find that defendant left the child unattended in a bathtub with the water running. Also, trial counsel's decision not to seek an instruction on the lesser included offense of reckless conduct was reasonable trial strategy and thus did not constitute ineffective assistance of counsel.

¶ 2  Defendant, Stephanie A. Larson, appeals from the judgment of the circuit court of Winnebago County finding her guilty of endangering the life of her one-year-old child (720 ILCS 5/12C-5(a)(1) (West 2016)). She contends that she was not proved guilty beyond a reasonable doubt and that her trial counsel was ineffective for failing to seek an instruction on the lesser

included offense of reckless conduct (720 ILCS 5/12C-5 (West 2016)). We reject both contentions and affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The following facts were established at defendant's jury trial. At approximately 6:35 p.m. on October 23, 2017, in response to a 911 call, Officer Adam Wolgast of the Loves Park Police Department was dispatched to a mobile home in Loves Park.

¶ 5     When Officer Wolgast arrived, there were ambulance personnel already there. He saw paramedics in the rear of an ambulance performing cardio-pulmonary resuscitation (CPR) on one-year-old E.L. Officer Wolgast also saw E.L.'s father, Aaron Fletcher, outside the mobile home. When Officer Wolgast entered the mobile home, he was directed to a bathroom. There he saw a bathtub that was about half full of water. The water was not running.

¶ 6     After exiting the bathroom, Officer Wolgast saw defendant, E.L.'s mother, in the kitchen/living room area. She was visibly upset and crying. Defendant told Officer Wolgast that she was a stay-at-home mother and that Fletcher worked all day. She said that, when Fletcher had arrived home from work, he said hello to her and their four-year-old daughter, B.L., then walked down the hallway toward the bathroom. She then heard Fletcher yell to her to call 911, which she did.

¶ 7     According to Officer Wolgast, defendant told him that she had put E.L. in the bathtub to bathe her. After doing so, defendant returned to the kitchen to finish cooking dinner. She estimated that Fletcher arrived about 10 minutes later. Officer Wolgast asked defendant how much water was in the tub when she left E.L. unattended, and defendant answered, "not that much." Later at the scene, Officer Wolgast questioned defendant again, seeking to clarify how much water was in the tub when she left E.L. unattended. Defendant replied that she did not recall turning on

the water. When Officer Wolgast returned to the bathroom, he observed that the water was draining slowly.

¶ 8 According to Fletcher, he and defendant lived together with their two daughters, E.L. and B.L. Between 5:30 a.m. and 6 a.m., on October 23, 2017, he had left for work. Defendant and the two girls were asleep.

¶ 9 At about 6:30 p.m. that day, Fletcher arrived home from work. Defendant was in the kitchen with B.L. Fletcher said hello and walked to the bathroom. As he approached the bathroom, he heard the water running in the tub. When he entered the bathroom, he saw water running in the tub. Fletcher then saw E.L. floating in the tub. He pulled her out and began performing CPR. According to Fletcher, E.L. was not breathing. On cross-examination, Fletcher testified that the tub drain was closed and the tub was about three-quarters full.

¶ 10 E.L. ultimately was taken to a hospital and placed on life support. About a week later, Fletcher and defendant decided to remove E.L. from life support, and she died.

¶ 11 On October 25, 2017, Fletcher met with a police detective at the mobile home. The detective asked him to turn on the water in the tub. He and the detective determined that it took about 10 minutes for the water to reach the overflow drain.

¶ 12 On October 23, 2017, Detective Matthew Rankin of the Loves Park Police Department was assigned to investigate E.L.'s death. When he arrived at the scene, he saw defendant outside the mobile home. She was then allowed to go to the hospital.

¶ 13 On October 25, 2017, Detective Rankin met with defendant at the Loves Park Police Department. After speaking with defendant, he typed a statement based on what she told him. Defendant reviewed and signed the statement.

¶ 14    Detective Rankin read defendant's statement in court. According to defendant, on October 23, 2017, she had stayed up with B.L. and E.L. until around 3 a.m. At that time, she took E.L., who had fallen asleep, and laid her down in the girls' bedroom. Defendant left B.L. on the sofa in the living room with the television on. According to defendant, B.L. had been sleeping in the living room because their puppy had been defecating on B.L.'s bed.

¶ 15    After putting E.L. to bed, defendant went into her bedroom and went to sleep. Sometime that morning, defendant awoke and saw that she had an Instagram message from Jonathan Riley, a man she had met on Twitter. According to defendant, she and Riley talked on the telephone and messaged on Instagram. Defendant did not exit the bedroom until around 4 p.m. that afternoon. During the time she was in her bedroom, she never checked on or fed either E.L. or B.L.

¶ 16    When defendant exited the bedroom, she went into the living room where B.L was watching television. Defendant then checked on E.L., who was asleep in the girls' bedroom. Defendant then watched a movie with B.L.

¶ 17    At around 6 p.m., defendant began to make dinner. As she did so, she heard E.L. crying in the bedroom. When defendant checked on E.L., her diaper was filled with feces. Defendant laid E.L. on her back in the bathtub and removed the diaper. After the diaper was removed, E.L. turned over onto her stomach. Defendant then took the diaper to the kitchen and put it in the garbage. According to defendant's statement, she "forgot that [she] left [E.L] in the bathroom when [she] went to the kitchen."

¶ 18    After returning to the kitchen, defendant continued cooking. As she did so, she messaged with Riley on Instagram as well as cleaned up a dog mess on the floor. She then served food to B.L. and ate her food while continuing to message with Riley. Shortly after dinner was over,

Fletcher, who was running late, arrived home. He was home about a minute or so when he went into the bathroom.

¶ 19    After Fletcher entered the bathroom, he yelled at defendant to come in. When she did, she saw Fletcher performing CPR on E.L. on the floor. She got her phone and called 911.

¶ 20    According to her statement, defendant could "not remember turning on the tub but [she] must have because the water was on."

¶ 21    After reading defendant's statement, Detective Rankin testified that, sometime after meeting with defendant at the police department, he returned to the mobile home. He and Fletcher went into the bathroom, and Detective Rankin turned on the water in the tub. He allowed the water to fill to the overflow drain, which took 11 minutes and 4 seconds. It then took the water 11 minutes and 29 seconds to drain.

¶ 22    On cross-examination, Detective Rankin admitted that he did not document the rate of the flow of water into the tub. He also did not know if the drain was open or closed when E.L. was in the tub.

¶ 23    Steven Saunders, a child protection investigator for the Department of Children and Family Services (DCFS), met with defendant at the mobile home to gather information about the incident. According to Saunders, defendant said that she had been up all night on October 22, 2017, and did not go to bed until early in the morning on October 23, 2017. Defendant told Saunders that B.L. typically slept in the living room because she would watch television or movies late at night. Although defendant could not remember what time she got up on October 23, 2017, she stated that she usually got up around 3 or 4 p.m.

¶ 24    Defendant told Saunders that after getting up that day, she fed B.L. and cleaned up after the dog. She said that E.L. was sleeping. She estimated that E.L. awoke sometime after she began cooking dinner.

¶ 25    As she was working in the kitchen, defendant heard E.L. fussing in the bedroom. Defendant then went into the bedroom, found E.L. awake, and noticed that her diaper was full of feces. Defendant told Saunders that she took E.L. out of the crib, removed her diaper, sat her in the bathtub, and turned on the water. She then took the diaper to the kitchen and continued to tend to dinner. Saunders then had defendant turn on both the hot and cold water full stream in the tub. He determined that it took 10 minutes and 43 seconds to fill the tub.

¶ 26    Saunders and defendant then went to the kitchen. Because defendant told him that the television and furnace were on while she was in the kitchen and E.L. was in the tub, Saunders had defendant turn both on. With both on, he could not hear the water running in the tub.

¶ 27    Defendant told Saunders that, after leaving E.L. in the tub, she did not return to the bathroom until Fletcher called her to after he arrived home about 6:30 p.m. She could not recall if the water was still running or if Fletcher had turned it off. She also could not remember if she had put in the drain plug.

¶ 28    Defendant testified on her behalf. According to defendant, she was 26 years old and had graduated high school. While in high school, she was designated as a special-education student. Although she did not know why she was in special education, she had difficulty focusing, comprehending, and remembering.

¶ 29    Defendant described her state of mind in October 2017 as depressed and sad. She maintained a nocturnal schedule with B.L. and E.L., because she wanted them to be awake when

Fletcher came home from work. Defendant was the primary caretaker of the children. She described E.L as being able to crawl, stand but not walk, and hold her bottle and grasp toys.

¶ 30    Defendant identified a photograph of the kitchen as it appeared on October 23, 2017. The table was set for four, including E.L.'s highchair. According to defendant, they had two cats and a very hyperactive puppy. The dog would defecate everywhere and would also chew soiled diapers.

¶ 31    When asked what time E.L. awoke on October 23, 2017, defendant testified that she could not recall because she was not good with time. She estimated times to the police because she felt pressured to do so.

¶ 32    When E.L. awoke, she was crying. Defendant saw that E.L.'s diaper was "nasty," so she removed it in the tub. She put E.L. "in the tub and [she] saw that [E.L] needed a bath." Defendant then went into the kitchen to dispose of the dirty diaper. According to defendant, removing E.L.'s diaper was the last thing she remembered doing in the bathroom. The next thing she recalled was starting to cook dinner in the kitchen. At that same time, she began checking messages on her computer. When asked if there were any distractions at the time, defendant answered that she was wondering where Fletcher was because he was late. She added that she was also trying to get B.L. to eat her food and that the television was on. When asked if she thought about E.L. while in the kitchen, defendant answered that her "mind was shut off completely because [she] was worried about [Fletcher]."

¶ 33    The next thing that defendant remembered was Fletcher arriving home shortly after she had served food to B.L. After asking him where he had been, she asked him if he would tell B.L. to eat. Fletcher then went into the bathroom. He cussed at defendant and told her to come in there. She went in, and Fletcher told her to call 911, which she did.

¶ 34     After E.L. was in the hospital for about a week, doctors discussed with defendant and Fletcher about whether they wanted to terminate life support. Defendant described the decision to do so as very difficult.

¶ 35     When defendant was asked if she knew whether she had turned on the water in the bathtub, she answered no. She denied being consciously aware while in the kitchen that there was water running in the tub. She also denied "do[ing] anything" to the drain in the tub. When asked why there would be a discrepancy between her testimony and what she told DCFS and the police about turning the water on, defendant said that, because of the stress of E.L. being in the hospital, she "couldn't focus on the situation." When she spoke to the police and DCFS, she had thought that, because the water was on, she must have turned it on. As of trial, however, she did not know whether she had turned the water on.

¶ 36     On cross-examination, defendant testified that after seeing E.L.'s dirty diaper, she put her in the tub. She took off the diaper in the tub. She then went into the kitchen, which was a couple of seconds away, to dispose of the diaper. After putting the diaper in the garbage, defendant resumed preparing dinner. As she prepared dinner, she also had an online conversation with Riley. She also cleaned up after the dog. Defendant could not recall the details related to her preparation of the meal or whether she ate before Fletcher arrived home.

¶ 37     She admitted that she provided times to Detective Rankin as to when she awoke and when Fletcher arrived. She also admitted to having signed the typed statement.

¶ 38     After the defense rested, the parties agreed that the jury would be instructed on the elements of the child-endangerment charge and separately instructed on whether defendant proximately caused E.L.'s death. The jury was further instructed regarding the definition of knowledge and proximate cause. If the jury were to find that the State proved the two elements of child

endangerment, but not that defendant's conduct proximately caused the death of E.L., then defendant would be convicted of a Class A misdemeanor version of child endangerment and sentenced accordingly.

¶ 39    The jury found defendant guilty of child endangerment and also found that her conduct was the proximate cause of E.L.'s death. Accordingly, defendant was convicted of a Class 3 felony. Following the denial of her motion for a new trial, she was sentenced to two years' probation, including 180 days of periodic imprisonment. After her motion to reconsider sentence was denied, she filed this timely appeal.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, defendant contends that (1) the evidence was insufficient to prove beyond a reasonable doubt that she knowingly endangered E.L.'s life; and (2) that her trial counsel was ineffective for failing to request a jury instruction on the lesser included offense of reckless conduct.

¶ 42    In evaluating the sufficiency of the evidence, it is not the province of the reviewing court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261. The weight to be given the witnesses' testimony, the determination of their credibility and the reasonable inferences to be drawn from the evidence are all matters for the trier of fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999). Likewise, resolving any conflicts or inconsistencies in the evidence is also within the province of the fact-finder. *Collins*, 106 Ill. 2d at 261-62. Indeed, a fact-finder need not accept the defendant's version of events as among competing versions. *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001). We will set

aside a criminal conviction only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of a defendant's guilt. *Smith*, 185 Ill. 2d at 542.

¶ 43    The Criminal Code of 2012 (Code) provides that a person endangers the life or health of a child when she knowingly (1) causes or permits the life or health of a child under age 18 to be endangered; or (2) causes or permits a child to be placed in circumstances that endanger the child's life or health.  720 ILCS 5/12C-5(a) (West 2016).  A person is said to act knowingly when she is consciously aware that her conduct is practically certain to cause the offense defined in the statute. *People v. Penning*, 2021 IL App (3d) 190366, ¶ 19.  Knowledge, by its very nature, is ordinarily proved through circumstantial rather than direct evidence.  *Penning*, 2021 IL App (3d) 190366, ¶ 19.  The State must present sufficient evidence from which an inference of knowledge can be made.  *Penning*, 2021 IL App (3d) 190366, ¶ 19.  A defendant need not admit knowledge for the trier of fact to conclude that she acted knowingly.  *Penning*, 2021 IL App (3d) 190366, ¶ 19.

¶ 44    Here, the record contains ample evidence, when viewed in the light most favorable to the State, that defendant knowingly endangered E.L.'s life.  First, it was undisputed that defendant knowingly placed E.L. in the tub and left her unattended for at least 10 minutes.  An unattended child of E.L's age, who could stand and also hold and grasp items, could have turned on the water and plugged the drain without realizing the danger of drowning.  Knowingly leaving E.L. in the tub unattended, even without turning on the water, constituted child endangerment.

¶ 45    More importantly, there was evidence that defendant knowingly turned on the water before she left the bathroom.  Defendant (1) told Officer Wolgast that she had placed E.L. in the tub to bathe her, but she gave Wolgast conflicting statements about whether she remembered turning the water on; (2) told DCFS investigator Saunders that she had sat E.L. in the tub and turned on the water; and (3) told Detective Rankin that, although she could not recall turning on the water, "[she]

must have because the water was on." Further, Fletcher testified that, when he entered the bathroom, the water was running in the tub. Viewing this evidence in the light most favorable to the prosecution, we conclude that a rational jury could find that defendant knowingly had turned on the water before leaving E.L. unattended in the tub.

¶ 46 Defendant contends that the State did not prove that she knowingly left E.L. unattended in the bathtub, because she had issues with focus, comprehension, and memory, which prevented her from realizing the danger once she left the bathroom. However, defendant's difficulties focusing and remembering did not preclude her from being consciously aware of the danger that she created by leaving E.L. unattended in the bathtub. Indeed, part of the danger that defendant created was the significant risk that she would become distracted after leaving E.L. in the bathroom. She did become distracted by continuing to prepare dinner, cleaning up after the dog, and messaging with Riley. It was the risk of forgetting to check on E.L. that constituted the danger of leaving her alone in the bathtub.

¶ 47 When viewed in the light most favorable to the State, there was ample evidence from which the jury could reasonably infer that defendant knowingly left E.L. unattended in the tub with the water running while defendant prepared dinner and attended to other matters in the kitchen. Thus, she was proved guilty beyond a reasonable doubt of endangering the life of a child.[1]

¶ 48 Next, we address whether trial counsel was ineffective for failing to request an instruction on reckless conduct. Analyzing whether trial counsel was ineffective requires this court to apply

---

[1] We note that defendant does not contend that the evidence was insufficient to prove beyond a reasonable doubt that she proximately caused E.L.'s death. Thus, we do not decide that issue.

the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). Under that standard, a defendant who alleges that his trial counsel was ineffective must establish that (1) his attorney's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Wendt*, 283 Ill. App. 3d 947, 951 (1996).

¶ 49    Under the first prong, a defendant must show that no reasonably effective attorney, when confronted with the circumstances at trial, would have engaged in similar conduct. *People v. Fletcher*, 335 Ill. App. 3d 447, 453 (2002). In doing so, a defendant must overcome the strong presumption that the challenged action or inaction might have been the product of a sound trial strategy. *People v. Smith*, 195 Ill. 2d 179, 188 (2000). Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *Smith*, 195 Ill. 2d at 188.

¶ 50    Under the second prong, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Manning*, 241 Ill. 2d 319, 326 (2011). A reasonable probability is a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair. *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 51    Counsel's decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy that are generally immune from ineffective assistance claims. *People v. Lemke*, 384 Ill. App. 3d 437, 450 (200). However, it is the defendant's decision to submit an instruction on a lesser charge at the conclusion of the evidence. *People v. Brocksmith*, 162 Ill. 2d 224, 229 (1994). A lesser charge in this context means a lesser included offense. *People v. Wilmington*, 2013 IL 112938, ¶ 48.

¶ 52    Further, a decision to pursue an all-or-nothing defense is a valid trial strategy. *People v. Jackson*, 2018 IL App (1st) 150487, ¶ 29. The mere fact that an all-or-nothing strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance. *Jackson*, 2018 IL App (1st) 150487, ¶ 29. Rather, an all-or-nothing strategy may be unreasonable only if it (1) was based upon counsel's misapprehension of the law or (2) was the functional equivalent of withdrawing a lesser included offense instruction. *Jackson*, 2018 IL App (1st) 150487, ¶ 29.

¶ 53    The State initially asserts that reckless conduct was not a lesser included offense of child endangerment as charged. We disagree.

¶ 54    Our supreme court has established a two-step approach for determining whether a defendant is entitled to an instruction on a lesser included offense. *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 45 (citing *People v. Ceja*, 204 Ill. 2d 332, 360 (2003)). First, the court must determine if the charging instrument describes the lesser included offense such that the lesser included offense has a broad foundation in the language of the indictment; that is, that the indictment sets out the main outline of the lesser included offense. *Kidd*, 2014 IL App (1st) 112854, ¶ 45. It is not fatal if every element of the lesser included offense is not explicitly contained in the indictment, as long as the missing element can be reasonably inferred. *Kidd*, 2014 IL App (1st) 112854, ¶ 45. Second, the court must determine whether the evidence presented at trial would permit the jury to rationally find the defendant guilty of the lesser included offense but not guilty of the greater offense. *Kidd*, 2014 IL App (1st) 112854, ¶ 45.

¶ 55    An individual commits reckless conduct when she causes bodily harm or endangers the bodily safety of an individual or causes great bodily harm by any means if her acts are performed

recklessly. 720 ILCS 5/12-5(a) (West 2016). Further, recklessness is a less culpable mental state than knowledge. *People v. Fornear*, 176 Ill. 2d 523, 531 (1997).

¶ 56    We conclude that, based on the indictment, reckless conduct was a lesser included offense of child endangerment. First, the indictment here stated that defendant knowingly endangered the life of E.L. by leaving her unattended in a bathtub, resulting in E.L.'s death. That language set out the main outline of reckless conduct. Although the charge did not use the mental state of recklessness, it did allege that defendant caused great bodily harm (death) to E.L., or endangered her bodily safety, by leaving her unattended in the bathtub. Further, the mental state of recklessness, although not explicitly set forth in the indictment, could have been reasonably inferred.

¶ 57    Second, the evidence would have permitted the jury to find that that defendant did not act knowingly but that she did act recklessly. That would have allowed the jury to find defendant not guilty of child endangerment but guilty of the lesser included offense of reckless conduct. Thus, an instruction on the lesser included offense of recklessness was a viable option.

¶ 58    However, the record shows that trial counsel opted for an all-or-nothing strategy on the charge of child endangerment. Although an instruction on reckless conduct was a viable option, counsel chose not to go that route and opted instead to give the jury the choice of finding her client guilty of child endangerment or acquitting her. The decision to pursue an all-or-nothing strategy on the charge of child endangerment was a matter of trial strategy and not subject to an ineffectiveness claim. Further, counsel buffered that approach by requesting, and receiving, an instruction on whether defendant's conduct was the proximate cause of E.L.'s death, and also a related instruction on the misdemeanor version of child endangerment (based on a finding that defendant did not proximately cause E.L.'s death). Such instructions provided the jury with the

option of finding defendant not guilty of felony child endangerment but guilty of the misdemeanor version. The decision to pursue an all-or-nothing strategy on the charge of child endangerment was a matter of trial strategy. Nor is there any indication that counsel misapprehended the law in that regard or that counsel's decision was the functional equivalent of withdrawing a lesser-included-offense instruction. See *Jackson*, 2018 IL App (1st) 150487, ¶ 29.

¶ 59 Of course, had defendant requested her counsel to seek an instruction on reckless conduct, and trial counsel had rejected that approach, our conclusion might be different. See *Brocksmith*, 162 Ill. 2d at 229. However, the record does not show that counsel rejected such a request by defendant.[2]

¶ 60                                III. CONCLUSION

¶ 61 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 62 Affirmed.

---

[2] We note that a defendant must generally raise a claim of ineffective assistance of counsel on direct appeal or risk forfeiting the claim. *People v. Veach*, 2017 IL 120649, ¶ 47. Procedural default does not, however, preclude a defendant from raising a claim on collateral review if it depends on facts not in the record. *Veach*, 2017 IL 120649, ¶ 47.